IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Robert Twyman, Jr., | § | |
| Petitioner, | § | |
| V. | § | Case No. 2:06-CV-833-MEF |
| Alabama Department of Corrections, et al., | § | |
| Respondents. | § | |

## PETITIONER'S BRIEF ARGUMENT IN SUPPORT

In the interest of judicial administration, comprehensive disposition of litigation, conservation of judicial resource and fairness to all parties, would be for this Writ of habeas Corpus to be granted.

The Alabama Criminal Justice Information System (ACJIS) is connected to system that houses nationwide criminal records, the National Crime Information Center (NCIC). The ACJIS, which is based in Montgomery, Alabama, is maintained for the use of Alabama law enforcement personnel. The NCIC, which is based in Clarksburg, West Virginia, is maintained by the Federal Bureau of Investigation (FBI) and is used nationwide by police agencies. If a name is checked through the ACJIS, it is usually automatically run through the NCIC databases as well. Access to both the ACJIS and NCIC is circumscribed by strict rules requiring that they be utilized for law enforcement purposes only. Specifically, to access the ACJIS, and NCIC, local law enforcement agencies must agree in writing to adhere to the rules and regulation governing the NCIC, and to use the system only for legitimate law enforcement purposes. See *United States v. Jordan*, 316 F.3d 1215, 1223 (11th Cir. 2003).

### *THE EVIDENCE CLEARLY SHOULD CONVINCE THIS COURT THAT NO REASONABLE TRIER OF FACT WOULD HAVE FOUND THE PETITIONER GUILTY AS A PAROLE VIOLATOR, IF NOT FOR THE CONSTITUTIONAL ERROR.*

Respondents have a history of inform law enforcement personnel around the United States, with misleading information to detain people, which have served sentences in the ALDOC, for the sole purpose of attaint custody of that person, once again.

> Agee contends that on July 4, 1971, he was released from Draper
> Prison and told that he was being placed on probation or parole and

1

would be contacted by the proper authorities. The State of Alabama contended below, and here, that Agee was not released but that he escaped from prison by changing from his prison uniform to civilian attire and "walking out with a visitor."

After leaving his confinement, Agee went to live with his father in Birmingham for two months. He then moved to Chicago, returned to Birmingham, and went back to Illinois. No one from the prison or parole authorities ever contacted him during the 12 years he was free, even though, meanwhile, on August 27, 1971, Agee had been indicted by the Elmore County grand jury. On July 7, 1983, Agee was returned to Alabama on a fugitive warrant for escape. He was given a disciplinary board hearing, after which the board found that Agee had violated an institutional regulation on escape. Agee lost store, telephone, and visitation privileges for 60 days; however, the felony escape charge against him was nol-prossed.

See *Ex Parte Agee*, 474 So.2d 161 (Ala. 1985)

On March 1, 1988, McCall was sentenced to two 15-year split sentences. He was credited with having served 4 months and 15 days prior to his guilty pleas and sentences. His sentences were ordered to run concurrently with each other and with a Florida sentence. In August 1988, McCall was transferred to a prison in Florida and, after serving approximately 19 months, he was released on April 17, 1989. No detainer had been lodged against him. McCall thereafter resumed residency in Texas where, for approximately 18 months, he raised a family and maintained steady employment. Then he was arrested by Texas authorities for escaping from the Alabama Department of Corrections.

In the state's answer and motion to dismiss, the state admitted that no detainer was outstanding against McCall at the time of his release because the Alabama Department of Corrections' detainer had been sent to the Okaloosa County, Florida, jail and had not been forwarded to the Florida Department of Corrections.

See *McCall v. State*, 594 So.2d 733 (Ala.Crim.App. 1992)

McCorvey alleged the following facts:
May 14, 1989: He was convicted of a federal offense for which he was sentenced to 4 months' imprisonment and 2 years' supervised probation.

June 25, 1991: He was convicted of a felony in Alabama for which he was sentenced to 10 years' imprisonment. This conviction violated his federal probation and by agreement with the Alabama Department of Corrections, he was taken into federal custody to serve his federal sentence concurrently with his state sentence.

December 12, 1992: He was released from federal custody because his federal conviction was overturned. He returned to Chicago where he resumed his business, married, and began raising a family.

October 1994: He was arrested in North Carolina on a "fugitive escape hold" from Alabama after having been stopped by a state trooper, and he waived extradition to Alabama.

November 10, 1994: He was returned to the custody of the Alabama Department of Corrections.

2

> The state attached to its motion to dismiss McCorvey's petition the affidavit of the corrections records director of the Alabama Department of Corrections. She explained that because the Department had originally received information that McCorvey was in the custody of authorities in Fulton County, Georgia, the Department's detainer was placed with Georgia officials rather than with federal authorities; that she was notified on May 17, 1994, by the Alabama Board of Pardons and Parole that McCorvey had been released by the federal authorities; that McCorvey's last known contact with the Mobile Sheriff's Department was on May 31, 1993, when he was released on bond on city charges; that he was entered into the national crime information computer on May 27, 1994; that he was arrested on October 24, 1994; and that his scheduled release date is February 6, 1997.

See *McCorvey v. State*, 675 So.2d 81 (Ala.Crim.App. 1995)

> Anderson asserts that he is being held in custody after his sentences have expired; he alleges that his present incarceration is pursuant to a fugitive warrant and detainer that are invalid because, he says, they were issued after his sentences had expired. He presents the following chronology to support his argument:
> May 5, 1980 -- He started serving his concurrent five-year sentences.
> January 8, 1981 -- An employee of the Franklin County Sheriff's department transported him from the county jail to Riverchase Memorial Hospital and left him unguarded.
> January 9, 1981 -- Hospital personnel discharged him and told him that he was free to go.
> October 31, 1985 -- He was returned to the custody of Alabama authorities and placed in the Jefferson County jail. He was scheduled to testify in a federal trial and during his two-week stay, he talked to FBI agents and to Franklin County law enforcement authorities. After he testified, he was returned to the custody of the state of Kentucky and was paroled in Kentucky in July 1986. No warrant or detainer was filed with the Kentucky authorities by the Alabama authorities.
> May 2, 1987 -- He was arrested in Huntsville, Tennessee, and was incarcerated in the Scott County, Tennessee, jail. In the Fall of 1987, he pleaded guilty to the charges and was sentenced to 15 years.
> June 25, 1987 -- The Alabama Department of Corrections issued a fugitive warrant on Anderson for failure to complete his concurrent five-year sentences. A detainer was not filed at this time with the Tennessee authorities. Anderson claimed that had one been filed, he could have returned to complete his sentence or answer the information.
> September 1990 -- Anderson was transferred from the custody of the Tennessee Department of Corrections to the custody of the state of Kentucky for violation of his 1986 parole. No detainer had been filed with the Tennessee authorities by Alabama. He was released from Kentucky's custody in December 1991. Again, no detainer had been filed.
> May 5, 1993 -- While he was in the custody of the North Carolina Department of Corrections, the Alabama Department of Corrections filed a fugitive warrant based on his "escape." Sometime in May 1993, he received oral notice from North Carolina authorities that the Alabama authorities had filed a detainer against him for escape.

3

> February 9, 1994 -- He was informed that he was not wanted for escape, but was wanted for the completion of his five-year sentences.
>
> These facts, he alleges, show that from January 9, 1981, until May 5, 1993, neither he nor any state having custody of him at various times during this period had any indication that he was wanted by Alabama authorities. He further asserts that the Alabama authorities had several opportunities to know of his whereabouts and/or to file a proper warrant or detainer.

See *Anderson v. State*, 710 So.2d 491 (Ala.Crim.App 1997)

### *PREJUDICE IS A SHOWING THAT THE ALLEGED FEDERAL VIOLATION ACTUALLY AND SUBSTANTIALLY DENIED THE PETITIONER FUNDAMENTAL FAIRNESS.*

This Court should determine whether respondents breached any duty owed to the petitioner because a constitutional duty existed, evidence suggest respondents breached their duty was a cause in fact of inaccurate information being used to incarcerate petitioner. The recommendation of Probation Officer Linda Hill links respondents to the alleged inaccuracies is present. Petitioner can show this was an intentionally and maliciously acted to deprive him of his constitutional rights. See *Petitioner Theory of Conspiracy*.

It is beyond dispute that the F.B.I. does not and cannot guarantee the accuracy of information contained in its criminal files, "the F.B.I's function of maintaining and disseminating criminal identification records and files [pursuant to U.S.C. §534] carries with it as a corollary the reponsibility to discharge this function reliably and responsibly and without unnecessary harm to individuals whose rights have been invaded. Thus it has been held that a district court has the inherent power to order expungement of all or part of a subject's F.B.I. criminal record in those cases where F.B.I. retention of such information or records would present a harsh or unique situation with potential for harm to the subject. See attached copy of *Sadiqq v. Branlett*, 559 F.Supp. 362 (N.D. Ga. 1983).

Even if arrest record showing acquittal never falls into "authorized" hands, fact remains that (1) information is valueless if its retention is based upon some theory of law enforcement assistance to police at any level, since it has been determined to be unfounded in law. (2) it cannot form basis for any legitimate law enforcement investigation, (3) use of this information by "authorized" agencies would place subject

4

person at distinct disadvantage with other citizens, (4) use of information would of necessity be prejudiced specifically to rights of subject person as compared with rights enjoyed by all other citizens, and (5) such unfair state of affairs is devoid of fair play, violations of constitutional right of privacy as well as of presumption of innocence, and affront to sence of justice. See *United States v. Dooley*, 364 F.Supp. 75 (E.D. Pa, 1973).

Court will order expungement of arrest or conviction information appearing in F.B.I. files in order to remedy constitutional injuries substained by reason of such arrests or conviction. See *Tarlton v. Saxbe*, 165 U.S. App. D.C. 293, 507 F.2d 1116 (D.C. Cir. 1974). Expungement has been ordered in cases in which no probable cause existed for the subject's arrest, thus rendering the arrest unconstitutional.

Under 28 U.S.C. §2254 Federal Courts are authority to grant habeas corpus relief to those suffering under unconstitutional imprisonment.

Done this the 31st day of March 2008.

/s/ *Robert Turpman Jr.*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Robert Twyman, Jr.,         §
   Petitioner,              §
V.                          §         Case No. 2:06-CV-833-MEF
Alabama Department of Corrections, et al.,  §
   Respondents.             §

## PETITIONER'S THEORY OF CONSPIRACY

Petitioner believes that probation officer Linda F. Hill found some out-dated documents in her office computer concerning him, which should had been deleted, in 1998. The 13-page recommendation of the parole hearings shows, petitioner was not in the NCIC as a parole violator, until Hill contacted the Interstate Compact Unit.

The Respondents' Response to Request for Documents, shows on 2/20/04 the "Authorization to Issue Warrant for Paroled Prisoner" of 6/5/98 was entered into the IC computer.

Apparently, the IC computer's connects to the NCIC. For petitioner was not wanted as a parole violator, until 2/20/04. Respondents Response 11/8/06, Records of CR-04-1744 pg. 14, Talladega County Jail Inmate Grievance Form shows; Chief Flowers was having legal problems with petitioner. Petitioner knew there was no reason for his confinement in the Talladega County, Jail, even for Child Support. Flowers state; "Your are in here for failure to pay Child Support. You are not ADOC inmate as *Yet*."

Respondents Response to request for Documents shows (2) two Sending Confirmation. One to the Talladega Parole office (Linda Hill) and the other to the Talladega County Jail (Chief Flowers). The ABPP was not notified, directly of those acts. That when petitioner, became a parole violator, according to the NCIC and certain official in Talladega County.

A parole hearing was held at the Talladega County Jail. CR-04-1744 records pg. 15 shows that Hill requested a warrant from the ABPP but the warrant was never forwarded. Hill used the documents from her office computer at the parole hearing. The hearing was based upon what happen in Cobb County, Ga. in 1998, the same incident

which the ABPP had re-instated petitioner parole. Petitioner was found guilty at the parole hearing in Talladega County and the 13-page recommendation was prepared the same day.

Petitioner was the only person transferred to the Kilby Correctional Facility, by a Female County Sheriff Deputy. The officer said it seems the document for petitioners' to be confined in prison was a Fugitive Warrant. The ALDOC officer at Kilby saw the Commissioner signature, on the alleged warrant, without a second thought, except petitioner as a parole violator.

The parole hearing recommendation was forwarded to the ABPP from Talladega County, would seem in order to the ABPP members. The member without any doubt of any wrongdoing followed the recommendation of parole hearing officer, and sign off.

However, the entire arrest and parole hearing was fabricated by certain official in Talladega, and through the assistance of ALDOC official, place petitioner was placed in the Alabama Department of Corrections, as a parole violator.

Common Sense: If petitioner was wanted why would he come back to Alabama? He had Driver License and employed all under his name and SS# in the State of Alabama. Petitioner had not problems with any authorities since 1998, until he was arrested in Talladega County, Alabama, 2/13/04.

Done this the 31st day of March 2008.

/s/ *Robert Twymon jr.*

**ABDULLAH AMIN SADIQQ, a/k/a OLIVER LEE GREEN, Plaintiff, v. WEBB BRAMLETT and JACK OZMENT, Defendants**
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION
559 F. Supp. 362; 1983 U.S. Dist. LEXIS 18795
Civil Action No. C82-10A
March 4, 1983

**Summary:**

**Posture:**
Plaintiff inmate filed an action pursuant to 42 U.S.C.S. § 1983, which alleged that defendant law enforcement officers transmitted incorrect information to the Federal Bureau of Investigation (FBI). The inmate alleged that his FBI criminal file showed that he was convicted of both murder and armed robbery rather than murder alone and this misinformation damaged his character and caused him to be denied parole. Defendants sought summary judgment.

**Cite overview:**
Defendants were not entitled to summary judgment when neither party presented evidence that a constitutional duty had been breached, or that defendants were the ones who breached the duty and caused the alleged harm to the inmate.

**Overview:**
The court denied defendants' motion and found that neither party had submitted evidence that dealt with the material facts of the case and directed defendants to assist the inmate in gathering the necessary evidence. The court found that defendants acted under color of state law. The court could not determine whether defendants breached any duty owed to the inmate because even if a constitutional duty existed, no evidence had been introduced that would suggest either that the defendants breached this duty, or that this breach, if it occurred, was a cause in fact of the eventual appearance of inaccurate information on the inmate's master rap sheet. The court held that some evidence that would link defendants to the alleged inaccuracies had to be presented. Otherwise, it was just as likely that an FBI clerical employee made the mistake. The court held that even if the inmate proved a prima facie case, he could not recover against defendants unless he proved that they intentionally and maliciously acted to deprive him of his constitutional rights. The inmate had to submit evidence regarding when he first learned of the alleged violation for statute of limitations analysis.

**Outcome:**
The court denied defendants' motion for summary judgment in the inmate's § 1983 action.

Concepts:
Injury to reputation alone, apart from some more tangible harm to interests such as employment opportunities, does not implicate any liberty or property interests sufficient to invoke the due process protection guaranteed by the Fourteenth Amendment. To establish a claim under 42 U.S.C.S. § 1983 for violation of due process, more must be involved than simply defamation by a state official.

The "conditional liberty" interest recognized by the Supreme Court does not extend into a full-fledged right to have a completely error-free determination of one's eligibility for parole. The decision regarding parole eligibility is based on a discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done. To put it another way, there is simply no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence.

42 U.S.C.S. § 1983 provides as follows: Every person who, under color of any statute, ordinance, regulation, custom or usage of any state or territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges

© 2007 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. The statutory language itself indicates the primary elements of a plaintiff's prima facie case under § 1983.

Several courts have recognized a limited duty on behalf of the Federal Bureau of Investigation (FBI) to assure the accuracy of the criminal records it disseminates. While the parameters of this duty are as yet not fully clear, it is beyond dispute that although the FBI does not and cannot guarantee the accuracy of information contained in its criminal files, the FBI's function of maintaining and disseminating criminal identification records and files pursuant to 28 U.S.C.S. § 534 carries with it as a corollary the responsibility to discharge this function reliably and responsibly and without unnecessary harm to individuals whose rights have been invaded. Thus, a district court has the inherent power to order expungement of all or part of a subject's FBI criminal record in those cases where FBI retention of such information or records would present a harsh or unique situation with potential for harm to the subject. Generally, courts will order expungement of arrest or conviction information appearing in FBI files in order to remedy constitutional injuries sustained by reason of such arrests or convictions. However, mere acquittal standing alone is not in itself sufficient to warrant expungement of an FBI arrest record, largely because of the practical administrative problems a duty of this sort would create for federal record-keeping officials.

Prison officials are entitled to a qualified immunity from 42 U.S.C.S. § 1983 liability if there is no indication that they knew or should have known that their conduct would violate the plaintiff's constitutional rights.

Ga. Code Ann. § 3-1004 provides a two-year limitations period for actions for injuries to the person, and is the statute of limitations that applies to 42 U.S.C.S. § 1983 actions heard by federal district courts sitting in Georgia.

On any motion for summary judgment, the party seeking summary judgment bears the exacting burden of demonstrating that there is no actual dispute as to any material fact in the case. The evidence presented must be construed in favor of the party opposing the motion, and the opposing party must receive the benefit of all favorable inferences that can be drawn from the evidence. In addition, this court is mindful of its duty to view the pleadings of a pro se plaintiff liberally.

**Counsel**

Abdullah Amin Sadiqq, Hardwick, Georgia, for Plaintiff.

Frank H. Jones, Wright, Morgan & Jones, Rome, Georgia, for Defendant.

**Judges:** Robert H. Hall

Opinion

**Opinion by:** HALL

{559 F. Supp. 364} ORDER

This is a civil rights suit, brought under 42 U.S.C. § 1983. The plaintiff is a state prisoner, currently incarcerated at the Rivers North Unit in Hardwick, Georgia. The plaintiff's *pro se* complaint and request to proceed *in forma pauperis* were received in the clerk's office on January 5, 1982, and were approved by Magistrate Dougherty the same day. On July 15, 1982, Magistrate Dougherty allowed the plaintiff to amend his complaint to name as the sole defendants Webb Bramlett and Jack Ozment. These defendants subsequently filed the motion for summary judgment presently pending before this court.1

On May 9, 1972, plaintiff Sadiqq was arrested, charged with murder and armed robbery, and placed in the Floyd County Jail. On May 17, 1972, he was indicted on both offenses. On July 14, 1972, Sadiqq entered a plea of guilty to the charge of murder, and was sentenced to life imprisonment. The armed robbery charge was apparently dropped as part of his plea bargain. Sadiqq alleges that defendants Bramlett and Ozment, who were both employed by the identification department of the Floyd County (Georgia) Police Department at the time of Sadiqq's arrest, indictment, plea and incarceration, were

© 2007 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

responsible for the transmission of incorrect information regarding his crime and the disposition of his case to the Federal Bureau of Investigation.2 Specifically, Sadiqq contends that his F.B.I. criminal file shows, or implies, that he was convicted of both murder and armed robbery rather than murder alone.3 This, says Sadiqq, "has damaged his {559 F. Supp. 365} character and reputation and caused him to be denied parole," and he contends that he is entitled to recover damages from the persons responsible for this purported violation of his constitutional rights.4

Title 42, Section 1983 of the United States Code provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

> The statutory language itself indicates the primary elements of a plaintiff's *prima facie* case under § 1983. The requirement that the defendants must have committed the challenged conduct "under color of state law" has clearly been met here and merits no further elaboration. It is also necessary, however, that a defendant's actions be a cause of the plaintiff's constitutional deprivation. In other words, plaintiff Sadiqq must demonstrate that the defendants owed him a duty arising under the Constitution, {559 F. Supp. 366} that the defendants breached this duty, and that this breach was a cause in fact of Sadiqq's constitutional deprivation.

In determining whether Sadiqq has stated a *prima facie* case under § 1983, then, the threshold inquiry concerns the existence of a constitutional duty running from the defendants to Sadiqq. This question is apparently one of first impression, in that no court has ever held local law enforcement record-keeping officials liable under § 1983 for misinformation ultimately appearing in an F.B.I. criminal file. It is true that several courts have recognized a limited duty on behalf of the F.B.I. to assure the accuracy of the criminal records it disseminates. *Crow v. Kelley*, 512 F.2d 752 (8th Cir. 1975); *Tarlton v. Saxbe*, 165 U.S. App. D.C. 293, 507 F.2d 1116 (D.C. Cir. 1974); *Menard v. Saxbe*, 162 U.S. App. D.C. 284, 498 F.2d 1017 (D.C. Cir. 1974). While the parameters of this duty are as yet not fully clear, it is beyond dispute that although the F.B.I. does not and cannot guarantee the accuracy of information contained in its criminal files, "the F.B.I.'s function of maintaining and disseminating criminal identification records and files [pursuant to 28 U.S.C. § 534] carries with it as a corollary the responsibility to discharge this function reliably and responsibly and without unnecessary harm to individuals whose rights have been invaded." *Menard, supra*, 498 F.2d at 1026. Thus it has been held that a district court has the inherent power to order expungement of all or part of a subject's F.B.I. criminal record in those cases where F.B.I. retention of such information or records would present a harsh or unique situation with potential for harm to the subject. See, e.g., *United States v. Schnitzer*, 567 F.2d 536 (2nd Cir. 1977), *cert. denied*, 435 U.S. 907, 55 L. Ed. 2d 499, 98 S. Ct. 1456 (1978); *United States v. Benlizar*, 459 F. Supp. 614 (D.D.C. 1978). Generally, courts will order expungement of arrest or conviction information appearing in F.B.I. files in order to remedy constitutional injuries sustained by reason of such arrests or convictions. *Tarlton, supra*, 507 F.2d 1116. Expungement has been ordered in cases in which no probable cause existed for the subject's arrest, thus rendering the arrest unconstitutional. *Sullivan v. Murphy*, 156 U.S. App. D.C. 28, 478 F.2d 938 (D.D.C.), *cert. denied* 414 U.S. 880, 38 L. Ed. 2d 125, 94 S. Ct. 162 (1973); *Tarlton, supra*; *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967); and in cases in which the subject claims illegitimate police motive or purposeful harassment. *Wheeler v. Goodman*, 306 F. Supp. 58 (W.D.N.C. 1969), *vacated on other grounds* 401 U.S. 987, 91 S. Ct. 1219, 28 L. Ed. 2d 524 (1971). However, mere acquittal standing alone is not in itself sufficient to warrant expungement of an F.B.I. arrest record, largely because of the practical administrative problems a duty of this sort would create for federal record-keeping officials. See, e.g., *United States v. Linn*, 513 F.2d 925 (10th Cir.), *cert. denied* 423 U.S. 836, 96 S. Ct. 63, 46 L. Ed. 2d 55 (1975); *Coleman v. United States Department of Justice*,

© 2007 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

429 F. Supp. 411 (N.D. Ind. 1977); *United States v. Dooley*, 364 F. Supp. 75 (E.D. Pa. 1973).

At minimum, these cases teach that each case alleging an F.B.I. duty with respect to criminal records maintained by it must be considered in light of its particular facts and circumstances. Those courts that have thus far recognized any duty on the part of the F.B.I. to assure the accuracy of information entered in its criminal files have primarily been concerned about the inevitable dissemination of these F.B.I. files to numerous other agencies and entities, including prospective employers. The deleterious effect of having an arrest or conviction record -- even one on which an acknowledgment of acquittal has been entered -- is undisputed. Persons with criminal records may be much more vulnerable to police scrutiny concerning suspected involvement in later criminal activity, *Davidson v. Dill*, 180 Colo. 123, 503 P.2d 157 (Colo. 1972); and may be subject to decreased employment opportunities, *Menard v. Saxbe, supra*, 498 F.2d 1017, *Menard v. Mitchell*, 139 U.S. App. D.C. 113, 430 F.2d 486 (1970); as well as to the general "social stigma" attached to such records, *United States v. Dionisio*, 410 U.S. 1, 35 L. Ed. 2d 67, 93 S. Ct. 764 {559 F. Supp. 367} (1973). To the extent that the F.B.I.'s maintenance and dissemination of criminal records which inaccurately reflect a person's past criminal involvement can be said to rise to the level of a constitutional violation, the constitutionally protected rights at stake seems to involve one's rights to privacy and to be presumed innocent until proven guilty by means that comport with due process. And yet, the fact that courts have been willing in some cases to allow potential administrative burdens to override expunction of an arrest record after the arrestee has been acquitted strongly suggests that this "constitutional right," if it exists at all, is not absolute.

All of these cases have focused upon the F.B.I.'s own responsibility for records it keeps, and have largely ignored the substantial role played by the local law enforcement agencies that transmit arrest and conviction data to the F.B.I. in the first place. Yet, in *Menard v. Saxbe, supra*, 498 F.2d at 1025 & n.22, the court stated "we think sound principles of justice and judicial administration dictate that in general actions to vindicate constitutional rights, *by expungement* of arrest records maintained notwithstanding release of the person and absence of probable cause for arrest, be maintained against the local law enforcement agencies involved . . . this includes the agencies and officials with responsibility for making the arrest, initiating an arrest record, maintaining an arrest record, [and] determining appropriate disposition . . . . If more than one agency is involved there may be multiple defendants; indeed it may be that a single action may be maintainable against state and federal officials as well as the initiating local agency" (emphasis added). And in *Utz v. Cullinane*, 172 U.S. App. D.C. 67, 520 F.2d 467 (D.C. Cir. 1975), the plaintiffs brought suit against the District of Columbia Chief of Police and the Director of the Central Records Division of the District of Columbia Metropolitan Police Department, challenging on both constitutional and statutory grounds the Police Department's policy of routinely transmitting to the F.B.I. the fingerprint cards and identifying data of any individual arrested in the District.

The *Utz* court held that the plaintiffs were entitled to the declaratory and injunctive relief requested, based on its interpretation of the local ordinance that established the guidelines controlling dissemination of arrest records within the District of Columbia. For the purposes of the instant inquiry, however, the more significant aspect of the *Utz* opinion involves the tremendous attention paid by the court to the constitutional implications of the challenged police practice. The court stated in dicta that "there is a substantial bundle of constitutional rights which may be unnecessarily infringed when [preconviction and post-exoneration] arrest records are transmitted to the F.B.I. with the knowledge that they will be retransmitted to a multitude of organizations for a multitude of purposes, all of which are susceptible of abuse." *Id.* at 478. The *Utz* court, relying on prior cases in which expungement by the F.B.I. had been sought, suggested that such a practice violates one's constitutional right to be presumed innocent until proven guilty, and again focused primarily on the "considerable barriers" that an arrest record poses to one's educational, employment and licensing opportunities. *Id.* at 480. The court had before it persuasive evidence that information sent by the local Police Department to the F.B.I. was eventually entered onto master F.B.I. "rap sheets,"[5] which would then be disbursed to over 14,500 public and private agencies including the United States Civil Service Commission, the armed

© 2007 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

services, banks, and state and local governments. *Id.* at 471. While both the plaintiffs and the court in *Utz* acknowledged the legitimacy of dissemination of arrest records solely for law enforcement purposes, {559 F. Supp. 368} and even of the routine transmission of more limited catagories of information from the Police Department to the F.B.I., *Id.* at 475, the potential for abusive and prejudicial utilization of preconviction and post-exoneration arrest records moved the court to suggest that, but for the existence of an alternative statutory ground on which to base the plaintiffs' relief, the challenged practice would have been deemed unconstitutional. *Id.* at 483.

Although the dicta in *Utz* might support the availability of declaratory and injunctive relief against local law enforcement agencies who merely transmit information that is "incorrect" or harmfully misleading as to the nature and extent of the subject's prior criminal activity, *Utz* says nothing about a cause of action for *damages* against the individual persons or agencies responsible for the "erroneous" transmission. Moreover, neither *Utz* nor any other case attempts to draw distinctions among varying degrees and types of "incorrect" information; and it is inherently difficult to compare the de minimis inaccuracy of which Mr. Sadiqq complains with the existence of an arrest record on an individual who has subsequently been exonerated of the crime for which he was arrested.

At most, then, the *Utz* analysis suggests that an individual *may* have a constitutionally protected right to prevent local law enforcement agencies from disseminating some kinds of inaccurate information about his prior criminal involvement to the F.B.I. for ultimate inclusion on his master "rap sheet." This issue, as well as the degree of inaccuracy that must be present in order to give rise to a damage action under § 1983 against the parties responsible for the inaccuracy, are questions best left for another day, since the instant case in its present posture indicates that resolution of these matters at this time would be premature. Even if this court were to hold that the defendants did owe to Sadiqq a constitutional duty to transmit correct information to the F.B.I. concerning the arrest, conviction and ultimate disposition at issue here, absolutely no evidence has been introduced that would suggest either that the defendants breached this duty, or that this breach, if it occurred, was a cause in fact of the eventual appearance of inaccurate information on Sadiqq's master "rap sheet." The plaintiff must at least present some evidence as to both of these issues in order to raise genuine questions of material fact and thus avoid a grant of summary judgment in favor of the defendants, since these are both fundamental elements of the plaintiff's *prima facie* case under § 1983. Specifically, the plaintiff is directed to obtain as much information as possible as to the actual processes by which arrest and conviction data make their way from the local police department officials initially responsible for arrest and booking, through any and all intermediate processors, to the F.B.I. master "rap sheet" itself. *See also*, Footnote 3, *supra*. There must be some evidence personally connecting the defendants with the alleged inaccuracies, the very existence of which is, as this court has already noted, itself highly questionable. It is as likely, for instance, that any "error" of constitutional magnitude was committed by an F.B.I. clerical employee as by defendants Bramlett and Ozment; if that should be the case, the defendants would be entitled to summary judgment in their favor based on lack of causation in fact. Because the information needed by the plaintiff in order to establish his *prima facie* case is likely to be far more readily accessible to the defendants than to the plaintiff, the defendants are directed to cooperate fully with the plaintiff's attempts to obtain the materials he needs.

In addition, the plaintiff is reminded that even if he succeeds in establishing a *prima facie* case based on the guidelines set out above, he can only recover against the defendants if he proves that they intentionally and maliciously acted to deprive him of his constitutional rights. Prison officials are entitled to a "qualified immunity" from {559 F. Supp. 369} § 1983 liability if there is no indication that they "knew or should have known" that their conduct would violate the plaintiff's constitutional rights. *Procunier v. Navarette*, 434 U.S. 555, 55 L. Ed. 2d 24, 98 S. Ct. 855 (1978). Given the tremendous uncertainty, as discussed above, surrounding the existence of a duty on the part of prison record-keeping officers to transmit totally accurate information to the F.B.I., it can hardly be said the defendants did anything with actual or implied knowledge that they were violating Mr. Sadiqq's constitutional rights. It will thus be necessary for the plaintiff to demonstrate first that the defendants'

© 2007 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

actions were intentional and not merely negligent, and, in addition, that the defendants acted maliciously. *See, Wood v Strickland*, 420 U.S. 308, 322, 43 L. Ed. 2d 214, 95 S. Ct. 992 (1975). The court expresses no opinion on this matter at this time. The plaintiff is cautioned, however, that mere conclusory allegations of malicious conduct by the defendants, without supporting evidence, are insufficient to withstand the defendant's motion for summary judgment on the ground of qualified immunity, should this case reach that point. The plaintiff must therefore submit evidence tending to show that the defendants acted maliciously or intentionally.

In addition, the plaintiff must prove this court with evidence as to how and when he first became aware of the defendants' alleged violation of his rights, in order to avoid a dismissal of this case based upon Ga. Code Ann. § 3-1004. This section provides a two-year limitations period for "actions for injuries to the person," and is the statute of limitations that applies to § 1983 actions heard by federal district courts sitting in Georgia. *McMillian v. City of Rockmart, Georgia*, 653 F.2d 907, 909 (5th Cir., Unit B, 1981). The conduct challenged in this case apparently occurred in 1972; this action thus appears to be untimely. The plaintiff may, however, be able to introduce evidence tending to show that the cause of action did not actually accrue more than two years prior to his filing this lawsuit. *See, e.g., Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975) ("Federal law holds that the time of accrual is when plaintiff knows or has reason to know of the injury which is the basis of the action."). Similarly, the plaintiff may attempt to demonstrate that there are equitable reasons to justify tolling the statute of limitations for a period of time sufficient to construe the instant lawsuit as filed in a timely manner.

On any motion for summary judgment, the party seeking summary judgment bears the exacting burden of demonstrating that there is no actual dispute as to any material fact in the case. The evidence presented must be construed in favor of the party opposing the motion, and the opposing party must receive the benefit of all favorable inferences that can be drawn from the evidence. In addition, this court is mindful of its duty to view the pleadings of a *pro se* plaintiff liberally. *Haines v. Kerner*, 404 U.S. 519, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972). Virtually no evidence dealing with any of the material questions of fact presented by this case has been introduced by either party. Accordingly, the defendant's motion for summary judgment is DENIED at this time. All parties are directed to comply with all requests for additional evidence that appear throughout this order.

{559 F. Supp. 370} APPENDIX I, p. 1

**UNITED STATES DEPARTMENT OF JUSTICE FEDERAL BUREAU OF INVESTIGATION WASHINGTON, D.C. 20537**

The following FBI record, NUMBER 226 049 H, is furnished FOR OFFICIAL USE ONLY. Information shown on this Identification Record represents data furnished FBI by fingerprint contributors. WHERE FINAL DISPOSITION IS NOT SHOWN OR FURTHER EXPLANATION OF CHARGE IS DESIRED, COMMUNICATE WITH AGENCY CONTRIBUTING THOSE FINGERPRINTS.

| CONTRIBUTOR OF FINGERPRINTS | NAME AND NUMBER | ARRESTED OR RECEIVED | CHARGE |
|---|---|---|---|
| Floyd Co | Olvier Lee | 5-9-72 | murder & arme |
| Ident Bu | Green | | rob |
| Rome Ga | #20233 | | |
| SPr Reidsville Ga | Oliver Lee | 7-14-72 | murder & rob |

© 2007 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Green

#D-11011-63391

This FBI identification record is furnished to *Mr. Oliver Lee Green* pursuant to Departmental Order 556-73.

Notations indicated by * are NOT based on fingerprints in FBI files but are listed only as investigative leads as being possibly identical with subject of this record.

Exhibit "A"

{559 F. Supp. 371} APPENDIX I, p. 2

IDENTIFICATION DIVISION WASHINGTON, D.C. 20537

WASHINGTON, D.C. 20537

The following FBI record NUMBER 226 049 H, is furnished FOR OFFICIAL USE ONLY. Information shown on this Identification Record represents data furnished FBI by fingerprint contributors. WHERE DISPOSITION IS NOT SHOWN OR FURTHER EXPLANATION OF CHARGE OR DISPOSITION IS DESIRED, COMMUNICATE WITH AGENCY CONTRIBUTING THOSE FINGERPRINTS.

| CONTRIBUTOR OF FINGERPRINTS | NAME AND NUMBER | ARRESTED OR RECEIVED | CHARGE | |
|---|---|---|---|---|
| Floyd Co Ident Bu Rome Ga | Oliver Lee Green #20233 | 5-9-72 | murder & armed rob | Co Mu to l im |
| SPr Reidsville Ga | Oliver Lee Green #D-11011-63391 | 7-14-72 | murder | life |

Exhibit "B"

**Footnotes**

Footnotes

1   The plaintiff has also filed his own motion for partial summary judgment "on the grounds that there is genuine issues and material facts." Because the plaintiff has failed to enumerate the reasons for which he believes he is entitled to judgment as a matter of law, and rather has focused on what he perceives to be genuine material factual issues requiring disposition at trial, his "motion" will instead be construed as his opposition to the defendants' motion for summary judgment. This court is, of course, not precluded from *sua sponte* granting summary judgment in favor of the plaintiff if it appears that the plaintiff is in fact entitled to recover as a matter of law. 6 Moore's Federal Practice P 56.12; *Shadd v. United States*, 389 F. Supp. 721, 724 at n.2 (W.D. Pa. 1975).

© 2007 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

2   In paragraph IV of his *pro se* petition, the plaintiff also refers to a Georgia Bureau of Investigation file and to a Superior Court (presumably Floyd County) file, and intimates that misinformation concerning this charge and its disposition have been entered on these files as well. Throughout the remainder of the record, however, no further references are made to any criminal file other than that maintained on the plaintiff by the F.B.I. For purposes of the legal and factual issues involved in this case, it is immaterial whether the defendants' misconduct, if any, affected the plaintiff's state and local criminal record in addition to his F.B.I. record. This court will thus refer throughout the remainder of this order only to the alleged problems concerning his F.B.I. record.

3   This court is puzzled by the apparent inconsistency between "Exhibit A" and "Exhibit B" submitted with the plaintiff's motion for summary judgment, the relevant portions of which are attached to this order as Appendix I, pages 1 and 2. Exhibit "A" is dated 8-31-81, and Exhibit "B" is dated 10-15-81. At first glance, it seems to this court that the inaccuracy complained of by the plaintiff, appearing in the last two entries of "Exhibit A," has been corrected as evidenced in the last two entries of "Exhibit B." Were the plaintiff seeking declaratory or injunctive relief in order to prevent further transmission of inaccurate information to the F.B.I., there would be serious questions as to the existence of a ripe, non-moot, justiciable controversy in this case. Given that this is an action for damages pursuant to 42 U.S.C. § 1983, the constitutional violations allegedly committed by the defendants have "ripened" sufficiently to present a live controversy to this court at this point in time, in spite of what appears to be a complete correction of the F.B.I. file to reflect wholly accurate information. Nonetheless, evidence concerning the way in which the alleged inaccuracy was first spotted and by whom, the process by which the correction was ultimately made and by whom, and so on, is highly relevant to the central factual issue in this case, i.e., the manner by which information was transmitted from the defendants to their employers to the F.B.I. and eventually entered on the plaintiff's criminal identification record. This court acknowledges that because the F.B.I. is not, and in fact need not, be a named party to this action, such evidence may be somewhat more difficult to gather. Nevertheless, the parties are directed to submit to this court any and all evidence in their possession or reasonably obtainable by them relating to these matters. *See further*, this order at p. 12, *infra*, for a discussion of the significance of this evidence for the plaintiff's *prima facie* case under § 1983.

4   The plaintiff is reminded that injury to reputation alone, apart from some more tangible harm to interests such as employment opportunities, does not implicate any "liberty" or "property" interests sufficient to invoke the due process protection guaranteed by the Fourteenth Amendment. To establish a claim under § 1983 for violation of due process, more must be involved than simply defamation by a state official. *Paul v. Davis*, 424 U.S. 693, 701-710, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976). It is true that the plaintiff's complaint alleges that defendants' conduct deprived him of due process in that he has been repeatedly denied parole based on inaccuracies appearing in his F.B.I. file. Once again, however, the "conditional liberty" interest recognized by the Supreme Court in *Morrissey v. Brewer*, 408 U.S. 471, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972) does not extend into a full-fledged right to have a completely error-free determination of one's eligibility for parole. *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 60 L. Ed. 2d 668, 99 S. Ct. 2100 (1979). The decision regarding parole eligibility is based on "a discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done." Kadish, The Advocate and the Expert-Counsel in the Peno-Correctional Process," 45 Minn. L. Rev. 803, 813 (1961). To put it another way, there is simply "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz, supra*, 442 U.S. at 7. It is arguable, however, that at minimum a prisoner has a right to have the parole board consider a criminal record that accurately reflects the crimes for which he has been convicted and the penalties imposed, *see, e.g., Shadd v. United States*, 389 F. Supp. 721 (N.W.D. Pa. 1975), even if there is no set of facts which, if shown, mandate a decision favorable to the parole applicant. *Greenholtz, supra*, 442 U.S. at 10. Plaintiff Sadiqq has not, however, introduced any evidence suggesting that the parole board actually had before them an inaccurate copy of the plaintiff's criminal

© 2007 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

record. In fact, in light of the confusion surrounding the apparent conflict between plaintiff's Exhibits "A" and "B", *see* footnote 3 *supra* at p. 364-65, it is completely possible that the parole board, if they examined the plaintiff's F.B.I. identification record at all, looked only at a correct and accurate copy. If any evidence exists to contradict this supposition, the parties are directed to bring it to this court's attention.

5   These "rap sheets" are identical to the plaintiff's criminal record involved in this case. *See*, Appendix I, pages 1 and 2.

© 2007 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.